No. 119,797

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.S. and B.J.,
Minor Children.

SYLLABUS BY THE COURT

1.

A fit parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of his or her child.

2.

In determining the nature and extent of the process a parent is due, we use the three-factor balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Those three factors are: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedure used, including the fiscal and administrative burden additional or substitute procedure would incur.

3.

Proceedings in child in need of care cases "shall be disposed of without unnecessary delay. Continuances shall not be granted unless good cause is shown." K.S.A. 2018 Supp. 38-2246. A request to continue a hearing on a motion to terminate parental rights "shall be granted only if the court finds it is in the best interests of the child." K.S.A. 2018 Supp. 38-2267(a).

**4.**

The district court may terminate the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a). An appellate court reviewing that determination must find, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found the termination decision highly probable, i.e., supported by clear and convincing evidence.

**5.**

Under K.S.A. 2018 Supp. 38-2269(b)(7), the court considers the failure of reasonable efforts, not effective efforts, made by appropriate public or private agencies to rehabilitate the family.

**6.**

The State is not required to provide direct evidence that a parent's conduct is due to drug use or to provide direct evidence that a parent's drug use is harmful to a child if sufficient evidence shows that drug use impeded reintegration.

**7.**

After a district court finds a parent unfit, it must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). An appellate court reviews that determination for an abuse of discretion.

Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed June 21, 2019. Affirmed.

*Rachel I. Hockenbarger*, of Topeka, for appellant natural mother.

*Michael F. Kagay*, district attorney, and *Morgan L. Hall*, deputy district attorney, for appellee.

Before GARDNER, P.J., GREEN and ATCHESON, JJ.

GARDNER, J:  Mother appeals the termination of her parental rights to her two children. She contends that she was denied due process, that insufficient evidence shows her to be unfit, and that termination is not in the children's best interests. Having reviewed the record, we find no error.

FACTUAL AND PROCEDURAL BACKGROUND

Mother has two children, M.S. and B.J. In July 2015, when the children were six years old and one month old, the State filed a children in need of care (CINC) petition alleging that the children were not being properly fed, were in a home with domestic violence and drug use, and that their home was infested with rodents. As a result of these allegations, the children were placed in the temporary custody of the Kansas Department for Children and Families (DCF).

In August 2015, the children were adjudicated CINC. Mother was not present at that hearing, but Father stipulated to the allegations in the State's petition and entered a no-contest statement. The district court ordered that the children remain in DCF custody and adopted a proposed permanency plan with a goal of reintegration with Mother and Father.

In June 2016, the district court held a permanency hearing and adopted a dual case-plan goal of reintegration and adoption. But the district court later found reintegration was no longer viable and changed the case plan goal to adoption. The State then moved to find the parents unfit and to terminate their parental rights.

3

A three-day trial was set on the State's motion to terminate. At the beginning of the trial, Mother told the district court that her mother was in the hospital and that she may need to leave early to bring her home. Mother later requested a continuance to the next day, but the district court denied her request. The State presented its evidence then Mother presented her case-in-chief. The district court ended trial for the day and ordered Mother to appear at 9 a.m. the next morning.

Mother did not appear on the second day of trial. She did, however, speak with her attorney and asked her to notify the court that she had a transportation issue and would be late. Yet Mother failed to show, so the district court continued the trial to the following day.

On the third day of trial, Mother again failed to appear and failed to respond to her attorney's attempts to contact her. Her attorney, however, was present and indicated that Mother had no more evidence to present. The district court found Mother in default, heard a proffer by the State, reviewed the evidence the parties had presented, and then terminated Mother's parental rights.

We give no effect to the district court's finding that Mother was in default. As we have recently reminded courts, "At a hearing on a motion for termination of parental rights, a parent who fails to appear in person but who appears through counsel is not in default. In this situation, the district court errs by granting a default judgment terminating parental rights without receiving any evidence to support the motion." *In re K.H.*, 56 Kan. App. 2d 1135, Syl. ¶ 2, __ P.3d __ (No. 120,239, filed May 17, 2019). And we find it unnecessary to consider the effect of the State's proffer. See *In re J.M.B.*, No. 112,578, 2015 WL 4460578, at *11 (Kan. App. 2015) (unpublished opinion) (citing *In re J.F.*, No. 110,809, 2014 WL 3024367, at *4 [Kan. App. 2014] [unpublished opinion]). Here, the district court received and relied on evidence presented by both the State and Mother to justify its decision, rather than relying on Mother's failure to appear. We do the same.

The district court found the evidence clearly and convincingly showed Mother was unfit and was unlikely to change in the foreseeable future, based on the following factors:

K.S.A. 2018 Supp. 38-2269(b)(3) – "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;"

K.S.A. 2018 Supp. 38-2269(b)(7) – "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;"

K.S.A. 2018 Supp. 38-2269(b)(8) – "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

K.S.A. 2018 Supp. 38-2269(c)(2) – "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;" and

K.S.A. 2018 Supp. 38-2269(c)(3) – "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

The district court also found that termination of Mother's parental rights was in the best interests of the children.

Mother has timely appealed.

5

WAS MOTHER AFFORDED DUE PROCESS?

We first address Mother's argument that her due process rights were violated when the district court permitted the trial to continue and conclude without her being present. "Whether an individual's due process rights were violated is a question of law subject to de novo review." *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 81, 209 P.3d 200 (2009).

*Legal Principles*

Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008).

> "The right to due process is traditionally stated as the right to be heard at a meaningful time in a meaningful manner. Due process violations exist when a claimant is able to establish that the claimant was denied a specific procedural protection. *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007)." *In re S.D.*, No. 116,185, 2017 WL 2001662, at *5 (Kan. App. 2017) (unpublished opinion).

The specific procedural protection denied to Mother was a continuance of the trial.

> "Due process is not a fixed concept, but rather what procedures are necessary depends on the specific circumstances. *In re Habeas Corpus Application of Pierpoint*, 271 Kan. 620, 627, 24 P.3d 128 (2001). Also, due process is not a static concept. Its requirements vary to assure the basic fairness of each particular action according to the circumstances. See *In re J.L.D.*, 14 Kan. App. 2d 487, 490, 794 P.2d 319 (1990), *disapproved on other grounds by In re Adoption of B.J.M*, 42 Kan. App. 2d 77, 209 P.3d 200 (2009)." 2017 WL 2001662, at *5.

Mother, as a fit parent, has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the

care, custody, and control of her child. See *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). In determining the nature and extent of the process Mother was due, we use the three-factor balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *In re J.D.C.*, 284 Kan. 155, 166-67, 159 P.3d 974 (2007). Those three factors are: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens additional or substitute procedures would incur. *Eldridge*, 424 U.S. at 335. We examine these below.

1. *The individual interest at stake*

As explained, Mother has a constitutionally protected liberty interest in the relationship with her children. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. at 697-98. Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. *In re R.S.*, 50 Kan. App. 2d 1105, 1115, 336 P.3d 903 (2014). This court has previously stressed the importance of the interest at stake and has required a heightened scrutiny into the process afforded to a parent in termination proceedings. See *In re Adoption of B.J.M.*, 42 Kan. App. 2d at 84. This factor weighs in Mother's favor.

2. *The risk of erroneous deprivation of the interest through the procedures used and the probable value of additional or substitute procedural safeguards*

On the first day of trial, Mother explained that her mother was in the hospital with very low blood sugar and possibly other ailments. At the close of the State's evidence Mother requested a continuance to the next day so she could take her mother home from the hospital. Mother explained that she was the only caretaker for her mother. After some

discussion, the district court denied her request and required Mother to testify that day. Knowing Mother needed to leave, her attorney told Mother that she would proceed quickly through her direct examination. She did so. At the end of Mother's testimony, the district court continued the matter to the next day so Mother could leave early.

But Mother, although given the opportunity to do so, failed to appear on the second day of trial. Mother spoke with her attorney who conveyed Mother's assurance to the court that she would show up late, but Mother never appeared on the second day. Although it had no duty to do so, the district court continued the proceedings to the third day—a day previously scheduled for Mother's trial. Still, Mother failed to appear on the third day and did not respond to her attorney's attempts to contact her. She later explained that she had not come on the second day of trial because she had been in a physical fight with Father. Mother stated she understood that was no excuse.

"The second *Eldridge* factor involves the risk of erroneous deprivation of the right. *Eldridge*, 424 U.S. at 335." *In re S.D.*, 2017 WL 2001662, at *6. Mother relies heavily on *In re S.D.* in arguing that her due process rights were violated. But in *In re S.D.*, unlike here, the mother was not given the opportunity to present her case-in-chief:

> "Because Mother was not allowed to present her case-in-chief, there was a higher risk of erroneous deprivation. Additionally by continuing the trial to the third day, which was already scheduled for the trial, the risk of erroneous deprivation could have been severely reduced. The second *Eldridge* factor weighs in favor of finding a violation of due process." 2017 WL 2001662, at *8.

Here, in contrast, Mother was allowed to present her case-in-chief and did so on the first day of trial. She had the opportunity to be heard again on the second and third days of trial, yet she chose not to attend.

Mother was present, heard all the State's evidence, and cross-examined the State's witnesses. Mother presented her evidence the first day. The guardian ad litem did not present any evidence. No evidence was presented on the second or third day. The probable value to Mother of additional procedural safeguards—granting a continuance so the State could cross-examine Mother—is negligible. Because the probable value of additional procedural safeguards is low and the risk of erroneous deprivation is low, we find that the second *Eldridge* factor weighs in favor of the State.

3. *The State's interest in the procedure used*

Mother argues that although the State has an interest in quickly resolving this case and doing so in child time, it would have been no undue burden on the State or the guardian ad litem to have continued the trial for a few days or weeks to allow her a "chance to appear." We note that this type of continuance differs substantially from Mother's request to the district court, which was that the court continue the case from the first day to the second, so Mother could care for her own mother.

This court summarized the important legal principles under this factor in *In re S.D.*:

> "The third *Eldridge* factor is the State's interest in the procedure used. [424] U.S. at 335. In this factor, the administrative and fiscal burdens of additional or substitute procedures are considered. Because this is a case involving the care of children, the State has a heightened interest in resolving the case quickly and determining a course of action, which will lead to a stable home for the children. See *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). [Citation omitted.]" 2017 WL 2001662, at *7.

Those same interests are present here. The State argues that administrative and fiscal burdens would have arisen had the district court granted Mother an additional

continuance because the State would have had to re-subpoena any witnesses needed as a result of Mother's cross-examination.

And the State has an interest in protecting minor children. See *In re J.L.*, 20 Kan. App. 2d 665, 675, 891 P.2d 1125 (1995). Part of protecting the children means ensuring that the children have some stability in their lives, which means cases need to be completed in a timely manner. "It is a long established rule that timing in these cases should be considered in 'child time' rather than 'adult time.' *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2001)." *In re S.D.*, 2017 WL 2001662, at *7; see K.S.A. 2018 Supp. 38-2201(b)(4). Our statutes provide that proceedings in CINC cases "shall be disposed of without unnecessary delay. Continuances shall not be granted unless good cause is shown." K.S.A. 2018 Supp. 38-2246. A request to continue a hearing on a motion to terminate parental rights "shall be granted only if the court finds it is in the best interests of the child." K.S.A. 2018 Supp. K.S.A. 38-2267(a). Mother's children had been living in out-of-home placement throughout the proceedings—from July of 2015 to January of 2018.

We agree that the State's interest in concluding the trial quickly, even without Mother present, was justifiable. By the time this case proceeded to trial, the children were 8 and 2 years old and they had spent 31 months outside Mother's custody. Mother visited the children only five times over that period of time. While Mother argues that a few more weeks would induce little, if any, burden on the parties, we find this argument is unpersuasive in light of the children's young ages and ignores Mother's burden to show good cause and best interests. The third *Eldridge* factor weighs in favor of the State.

On balance, we find the *Eldridge* factors favor the State. Mother knew of her opportunity to be heard on the second and third days of trial and has shown no due process denial by virtue of the district court's failure to continue the case to another day.

In addition, apart from a due process review, this court reviews a district court's denial of a motion for continuance for abuse of discretion. *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). For the same reasons outlined above, the denial of Mother's continuance request did not constitute an abuse of discretion. We cannot find that no reasonable person would take the view adopted by the trial court. Moreover, the decision was not based on an error of law or fact. See 302 Kan. at 74. A speedy resolution to the case was in the best interests of the children.

## WAS THE DISTRICT COURT'S DECISION TO TERMINATE MOTHER'S PARENTAL RIGHTS SUPPORTED BY SUFFICIENT EVIDENCE?

Mother next contends that the district court's decision was not supported by sufficient evidence. As we have explained, a parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky*, 455 U.S. at 753; *In re B.D.-Y.*, 286 Kan. at 697-98. Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the court may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1.

Under K.S.A. 2018 Supp. 38-2269(a), the State, as the moving party, must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2018 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical

custody of a child. K.S.A. 2018 Supp. 38-2269(c). The State may also rely on 1 or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 2018 Supp. 38-2271.

In reviewing a district court's determination of unfitness, an appellate court asks whether, based on the full evidentiary record considered in a light favoring the State as the prevailing party, a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit and against Mother.

THE DISTRICT COURT DID NOT ERR IN FINDING THAT MOTHER IS UNFIT AND THAT HER CONDUCT OR CONDITION IS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE.

Mother argues that the district court erred in finding her unfit and that her unfitness was unlikely to change in the foreseeable future. Mother focuses on two matters: (1) an incomplete record stemming from her inability to present evidence on the third day of trial; and (2) the ineffectiveness of public and private agencies involved in this case.

*Incomplete record*

Mother first contends that we have an incomplete record stemming from her inability to present evidence on the third day of trial. Yet Mother chose not to attend the trial the third day or to inform her attorney or the district court why she could not appear. Mother does not state what evidence she now wishes she had presented, or how that evidence would have compelled the district court not to find her unfit. We have the entire trial transcript and are able to review the proceedings fully.

12

*Failure of reasonable efforts by public or private agencies*

Mother next challenges the reasonableness of the efforts made by the agencies involved in her case and argues that Kansas courts should require that *effective* efforts be made. Mother specifically attacks what she describes as the "ongoing problems with DCF/KVC having the resources to maintain adequately sized caseloads and staff with enough tenure and experience for case managers to be effective."

We must first address a procedural matter. The State correctly asserts that Mother failed to raise this issue in the district court. Generally, issues not raised before the trial court cannot be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011); *In re S.M.H.*, 33 Kan. App. 2d 424, 429, 103 P.3d 976 (2005). But we choose to reach the merits of Mother's argument based on an exception to the general rule prohibiting unpreserved issues on appeal. We believe consideration of this issue is necessary to serve the ends of justice or to prevent denial of fundamental rights. See *In re H.R.B.*, 30 Kan. App. 2d 599, 601, 43 P.3d 887 (2002).

Now we address the merits. It may well be that the public agencies involved in this case suffer from a lack of resources or consistent staffing. But K.S.A. 2018 Supp. 38-2269(b)(7) states the court shall consider the following: "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." We have previously addressed and rejected the argument that we should interpret this statute to require effective, rather than reasonable efforts to achieve rehabilitation of the family:

> "Mother's contention that the statute should be interpreted to require *effective*, rather than reasonable efforts to achieve rehabilitation of the family lacks merit for two reasons. First, it is contrary to the language of the statute itself and our well-developed body of caselaw surrounding what constitutes 'reasonable efforts.' Second, and equally important, basic logic compels the conclusion that requiring 'effective efforts' of public

and private agencies would allow parents to easily defeat the purposes of the statute, i.e., the protection and care of children, simply by not cooperating with those agencies.

. . . .

"The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort." *In re L.C.P.*, No. 118,841, 2018 WL 4039170 at *8-9 (Kan. App.) (unpublished opinion), *rev. denied* 309 Kan. __ (Dec. 31, 2018).

We find this case to be well-reasoned and adopt this rationale. Any change to require "effective efforts," rather than the "reasonable efforts" that the statute currently mandates, would come from the Legislature, not from this court.

The record in this case shows that the agencies' efforts, although not perfect, were reasonable as required by K.S.A. 2018 Supp. 38-2269(b)(7). Mother was sent to medical professionals, to receive medical diagnoses and treatment to assist Mother in resolving issues related to bipolar, sleep, and depressive disorders. Mother was also referred to a therapist who developed a treatment plan for her—this included taking her prescribed medications and attending weekly therapy. Derek Mower, Mother's substance abuse counselor, was available to assist Mother in attending therapy sessions. Mower assisted Mother in successfully completing a drug and alcohol program while Mother was incarcerated. Her counselor also facilitated a treatment plan for Mother once she was released from jail. And Mother also testified that her case managers assisted her in securing transportation to meetings and appointments. Even with all of these services provided to Mother, she failed to achieve her reintegration plan goals. The evidence supports the district court's finding that reasonable efforts by appropriate agencies to rehabilitate the family had failed.

14

*Use of intoxicating liquors or narcotics*

Mother also argues that the State failed to provide evidence that she was actively using drugs or that drug use impacted her ability to parent her children. Mother points to her successful completion of drug treatment while in jail and her follow-up with treatment providers once she was released as evidence that she no longer uses drugs.

Mother claims the State failed to directly show that drug use impacted her ability to parent her children. But no direct evidence of that fact, or any fact, is necessary. Any material fact may be proven not only by direct testimony, but also by indirect or circumstantial evidence, or by a combination of both. See *State v. Tillery*, 227 Kan. 342, 346, 606 P.2d 1031 (1980). The State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration. *In re J.L.*, No. 117,529, 2018 WL 1247167, at *3 (Kan. App.) (unpublished opinion), *rev. denied* 308 Kan. 1594 (2018). Similarly, the State need not provide direct evidence that a parent's drug use is in and of itself harmful to a child where clear and convincing evidence shows that the parent's failure to acknowledge his drug issues creates a significant impediment towards reintegration. In *In re C.A.G.-V.*, No. 113,334, 2015 WL 5224828, at *4 (Kan. App. 2015) (unpublished opinion) (finding: "While there may not be direct evidence that Father's drug use was in and of itself harmful to C.A.G.-V., there is clear and convincing evidence that Father's failure to acknowledge his drug issues created a significant impediment towards reintegration.") The same is true here. No exclusive mode of proof of the factors supporting termination is prescribed by law.

While Mother is correct that she took some important steps toward sobriety, Mother also admitted that she used drugs only two days after she was released from jail. And although Mother did initiate contact with Valeo Recovery Center, as recommended by her addiction counselor, Mother failed to meaningfully participate in drug abuse therapy. Mower testified that Mother had been unsuccessfully discharged from treatment

15

because she failed to attend group sessions. Mower testified that in the four months from Mother's intake to discharge from the program, she attended only five group sessions and two individual sessions. Likewise, Mower testified that Mother's participation in therapy was "sporadic" and Mother failed to get a sponsor. Mower also opined that Mother would likely use drugs again if she was not already.

Mother also points out that the urinalyses (UA's) she completed were negative for drugs. But Mother fails to acknowledge that she missed several UA's, which are considered positive, and that one UA showed trace amounts of methamphetamine. Carmen Thompson, Mother's case manager, testified that Mother missed as many UA's as she completed. Mother admitted that she quit drug treatment and had not tried to restart treatment by the time of trial. And Mother had not been to her weekly narcotics anonymous classes in over two weeks. The district court could reasonably infer from the evidence that Mother's drug use impeded her reintegration with the children.

The evidence, when viewed in the light most favorable to the State, supports the district court's findings. It is highly probable that a reasonable person would decide that Mother—an admitted methamphetamine user, who has not substantially participated in therapy and has tested positively for trace methamphetamine use—is unfit based on her drug use.

*Lack of effort to adjust her circumstances*

To challenge the district court's ruling under K.S.A. 2018 Supp. 38-2269(b)(8) Mother argues that her efforts to adjust her circumstances were "considerable." Mother points out that she obtained stable housing, established disability to receive disability payments as income, and participated in assessments, medical appointments, and drug treatment. Mother also suggests that she completed various tasks to keep her and her

16

children safe from Father, her abuser. Mother also argues that Father thwarted her efforts to adjust her circumstances.

Although Mother's circumstances were challenging, the district court considered these circumstances before making its decision. Before making its ruling regarding Mother's unfitness, the district court sympathized with Mother's circumstances:

> "[T]he Court truly believes that this mother has had a rough life. One might say she has, to a degree, been dealt a bad hand in the game of life. And for this the Court is sympathetic and understanding.
>
> "These cases are always difficult and when there is evidence that a person starts life with obstacles that many other people in life may not face, and that sometimes makes the Court's decision even more difficult, and sometimes very painful. The Court does empathize with Mother's plights and considers them. And the Court does believe, through at least some of the testimony that was presented, and through the reports that the Court was able to take judicial notice of, that this mother does love her children. But that's not the only thing that the Court must be concerned with when making its determinations. The Court cannot simply base its decisions regarding families and their futures on the parent's life and situations, or their love for their children, and a desire to reintegrate with them. The children's best interests are all [an] integral part of the Court's analysis and ultimate conclusions."

Although the district court's decision was a difficult one, it was correct.

True, Mother took some steps to adjust her circumstances, but she failed to follow through and finish what she began. For example, although Mother obtained housing by entering into a one-year lease, Mother was eventually required to leave that residence for a number of reasons, including fighting with Father and failing to maintain a clean home. After Mother could no longer live in the apartment she leased, she bounced between her mother's and grandmother's houses. She now ignores the impermanence in that choice and how the instability could affect her children. Although Mother received an

17

assessment and was prescribed medication to treat her diagnosed disorders, she refused to take her medication as prescribed. Mother did complete a drug treatment program while she was in jail but then admittedly relapsed only two days after she was released. Mother then initiated contact with Valeo Recovery Center for post-incarceration drug treatment but then failed to participate in group therapy sessions, resulting in her dismissal from the program.

Clear and convincing evidence shows that Mother had failed to make necessary efforts to adjust her circumstances. The district court did not err in finding mother unfit under K.S.A. 2018 Supp. 38-2269(b)(8).

*Failure to maintain regular visitation*

Mother argues that she did not fail to maintain regular visitation or contact with her children. Yet the record reflects otherwise.

Mother had only one visit with her children under the original KVC case worker. Mother had another visit scheduled during that time but missed that visit without giving notice. For over a year and a half, from November 2015 to June 2017, Mother had no visits with her children. Mother's visits began again after Father was released from prison. At that point, she was allowed to visit her children weekly and simply had to call and schedule those appointments, but Mother made it to only five visits within five months. During the first few visits, Mother was not actively engaged with the children. But later, Mother did engage with the children by getting down to their eye level and providing snacks for them. At other times, Mother failed to attend her scheduled visits and would not bother calling KVC to notify them before the children were already en route to the visit.

The times that Mother was a no-call, no-show, negatively impacted M.S. On one occasion, it even caused M.S. to self-harm by repeatedly punching herself in the face. B.J., however, was seemingly too young to understand Mother's actions, having been removed from her care when she was only one month old. In fact, B.J. seemingly never established a relationship with Mother.

The evidence clearly and convincingly shows that Mother failed to maintain regular visitation with her children.

*Failure to carry out a reasonable plan*

Mother challenges the district court's finding that she failed to carry out a reasonable plan approved by the court. Mother seemingly concedes that she failed to carry out the plan but excuses her failure by pointing to Father's abusive actions and a lack of resources. Mother argues that the tasks she failed to complete were unnecessary or unfair. Mother's arguments are without merit.

Mother was given a list of nine tasks. She failed to complete all but one of them.

- Mother was required to provide and maintain safe and stable housing for the children and provide documentation to the agency to prove she is doing so. Mother leased an apartment at one point but was later required to leave it. She then failed to provide documentation of suitable housing.

- Mother was required to provide documentation to KVC regarding a stable source of income, including disability. But Mother failed to provide any documentation regarding this task. Mother eventually provided evidence that she had secured disability income, but she failed to establish another form of income.

19

- Mother was required to complete a drug and alcohol assessment and follow through with its recommendations. Mother testified that she completed an assessment, but KVC never received proof that Mother completed treatment.

- Mother failed to complete the task of getting a mental health assessment and following the treatment recommendations.

- Mother failed to sign a release of her information showing the nature of her treatment at the Osawatomie State Hospital, as was necessary to determine her mental health status and needs.

- Mother was required to participate in KVC's color code system for UA's. Although Mother signed an agreement to participate, she failed to show up to some of her random UA appointments. Mother did test negatively when she participated in the UA's but one of her tests showed a "faint line for methamphetamine."

- Mother was required to participate and complete an anger management program approved by KVC. But Mother never completed that task, even though KVC felt it was of high importance due to the domestic violence issues between Mother and Father.

- Mother was required to contact KVC monthly to update her information. Mother complied with this task, "for the most part."

- Mother was required to complete a parenting program approved by KVC but she failed to do so.

Clear and convincing evidence thus shows that Mother failed to carry out a reasonable plan designed to integrate the children into her home.

From the evidence supported by the record, we find that a rational fact-finder could determine to a high probability that Mother was unfit to parent her children at the time of the termination hearing in the ways the district court identified.

*Foreseeable future*

Similarly, we find that Mother's unfitness was unlikely to change in the foreseeable future. When assessing the foreseeable future, this court uses "child time" as the measure. The Revised Kansas Code for Care of Children—K.S.A. 2018 Supp. 38-2201 et seq.—recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). Here, that factor takes on particular significance, given the children's very young ages and the lack of any real parental relationship between Mother and B.J. Finally, our courts may look to the parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P. 2d 467 (1982).

The evidence shows that Mother made little to no progress during the 31 months between the CINC proceedings and the termination hearing. We find clear and convincing evidence supporting the district court's finding that Mother is unfit and that her unfitness is unlikely to change in the foreseeable future.

21

## DID THE DISTRICT COURT ABUSE ITS DISCRETION IN FINDING THAT TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN?

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). As directed by this language, the district court gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1). The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The best interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. So an appellate court reviews the best interests decision for an abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

The evidence shows that Mother had a limited relationship with M.S. and had virtually no relationship with B.J. Mother's impact on M.S. was so negative that it eventually led to M.S.'s self-harm. Although Mother may have been dealing with Father and his abuse, she fails to show her ability to provide a safe home environment for her children, who have already endured a lengthy and disappointing process.

The district court expressly found that the physical, mental, or emotional needs of the children are best served by termination of Mother's parental rights given the ages of the children, the length of the case, and the interactions between the children and Mother. Having reviewed the facts, the law, and the record, we find no abuse of discretion in that conclusion.

Affirmed.

* * *

ATCHESON, J., concurring:  The district court properly terminated the parental rights of M.S. and B.J.'s mother, so I concur in affirming that ruling. I do not, however, subscribe to the majority's analysis of Mother's assertion that she was denied due process. But Mother was afforded all the constitutional process she was due and can claim no error on the point.

The essence of procedural due process guaranteed in the Fourteenth Amendment to the United States Constitution is the *opportunity* to be heard in a meaningful way at a meaningful time before suffering a deprivation of liberty or loss of property as the result of government action. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 17-18, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978) (due process entails protection against wrongful deprivation); *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' [Citations omitted.]"); 424 U.S. at 348-49 (due process requires procedures "be tailored" to the circumstances to "assure fair consideration"). Here, as the majority outlines, judicial extinguishment of parental rights inflicts a deprivation of liberty requiring procedural protections aimed at averting an erroneous result.

The elemental component of Mother's constitutional due process lay in her right to a hearing in front of a district court judge at which the State would have to prove her unfitness by clear and convincing evidence. Augmenting that right, Mother was entitled to be represented by a lawyer and to have a lawyer appointed for her if she could not otherwise afford representation. The lawyer (or Mother if she elected to represent herself) could cross-examine the State's witnesses and present witnesses and other evidence to

23

undermine the State's case. Mother's opportunity to have such a hearing satisfied her right to constitutional due process.

What Mother chose to do with that opportunity is largely beside the point. Mother did not attend the last two days of the three-day hearing. The State did not in any way impede her ability to appear. On the second day, Mother informed her lawyer she was having transportation problems but would show up. She didn't. The next day she did not communicate with her lawyer and simply failed to appear. Mother never offered an explanation for that failure.

Under those circumstances, Mother has no legal basis to complain about an impairment or denial of her due process rights—she received the opportunity required by the Fourteenth Amendment when the district court held the termination hearing she requested. Mother may then have squandered that opportunity, but her conduct in doing so doesn't create a due process violation. The result would be the same if Mother failed to appear for the entire termination hearing without good cause.[*]

[*]I put to one side situations in which parents could show they failed to appear for compelling reasons. For example, a genuine medical emergency requiring the parent's unexpected hospitalization, if proved, likely would be good cause excusing a failure to attend the hearing. I do not mean to offer some legal test for good cause that would avert forfeiture of due process protections in termination proceedings or any other context. Mother essentially concedes the lack of good cause for her absence, so the issue is not in play here.

The way the majority works through the due process issue seems to open up what may be unintended implications. And they are, in my view, improvident implications. In denying Mother's due process claim, the majority points out that she testified at the end of the first day of the hearing with her cross-examination by the assistant district attorney deferred to the next day. Mother, of course, didn't return and was never cross-examined. The discussion could be read to suggest that had Mother not yet testified on direct

24

examination, her absence from the remainder of the hearing would amount to a due process violation. But that would be incorrect, since the due process right entails the opportunity to be heard and the opportunity may be relinquished or abandoned without actually having been heard. The implication also raises all kinds of nice questions about how much of a termination hearing a parent might have to miss to create a due process violation. Those questions are irrelevant. A parent can't stymie a termination hearing by disappearing part way through the proceeding or claim a due process violation if the district court completes the hearing anyway.